J. W. PETERSEN COAL & OIL CO., an Illinois corporation, Plaintiff,

v.

UNITED STATES of America, Defendant and Cross-Claimant,

and

Dunbar & Sullivan Dredging Co., a New York corporation, Defendant.

No. 68 C 967.

United States District Court, N. D. Illinois, E. D.

April 8, 1970.

James W. Kissel, Geo. W. McBurney, Mark E. MacDonald, Sidley & Austin, Chicago, Ill., for plaintiff.

Thomas A. Foran, U. S. Atty., for the United States.

Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for defendant.

## MEMORANDUM

AUSTIN, District Judge.

J. W. Petersen Coal & Oil Co. (hereinafter referred to as Petersen) is and has been, since prior to June 1966, the owner of certain real estate situated along and under the North Branch Canal of the Chicago River. For many years this land has been used by Petersen as a coal storage yard in connection with its business of selling and transporting coal to various consumers in the Chicago area. Petersen constructed and has maintained a wooden dock for receiving coal transported on the Canal to be unloaded in Petersen's coal storage yard. In June 1966, the United States Army Corps of Engineers awarded a contract to Dunbar & Sullivan Dredging Co. (hereinafter referred to as Dunbar) for dredging the Chicago River and the North Branch Canal for the purpose of increasing the navigability of the North Branch Canal. The performance of this dredging operation, Petersen contends, caused a general movement of the soil supporting its dock which eventually resulted in damage to the entire dock.

Petersen filed this suit against Dunbar and the United States predicating its claim against the United States on the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The United States has moved to dismiss for lack of jurisdiction of the subject matter. It contends that jurisdiction over the subject matter is in admiralty as conferred by the Admiralty Jurisdiction Extension Act, 46 U.S.C. § 740. The United States has consented to be sued under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and therefore jurisdiction against the United States under the Federal Tort Claims Act is specifically excluded under 28 U.S.C. § 2680(d). The case must now be dismissed, the Government contends, because Petersen has presented no claim in writing to the federal agency involved six months before instituting suit as 46 U.S.C. § 740 requires. The point is an important one because if the Government is right then Petersen will be foreclosed from any further remedy against it because the statute of limitations under 46 U.S.C. § 745 has run.

The court concludes that some of the alleged activities of the Government may well give rise to admiralty jurisdiction under 46 U.S.C. § 740 but that under the present record the Government involvement in the actual operation of the vessel is too uncertain to conclude that a remedy is provided under the Suits in Admiralty Act. The motion will therefore be denied and the court will add its views on the issues involved in order to guide the parties in further proceedings in the case.

I. *Pleadings on United States Activities and Involvement in Connection with the Dredging Operation.*

 The pleadings and briefs on this motion are in conflict as to the part the United States played in the actual dredging operation and the parties themselves take inconsistent positions on the issue. The complaint alleges that "according to the contract terms the United States had the right to control Dunbar during the dredging operation and that inspectors and agents of the United States were physically present on Dunbar's vessel during dredging operations." [1] The Government in its answer denied this statement but did say that it provided maps giving the approximate locations of certain submarine cables in the river. The Government in its amended answer containing a cross-claim against Dunbar alleged that the dredging operations were all under the immediate custody, control, direction and supervision of Dunbar. In its answer to the cross-claim, Dunbar admitted the dredges, gear, and equipment were under its control but further stated that the supervision of the dredging operations was carried on by the United States pursuant to the terms of the contract. Petersen, in its memorandum of law in opposition to this motion stated that on further discovery it had learned that Dunbar actually operated the dredge but that the Government had prepared plans and specifications and had a government inspector aboard to assure compliance.[2]

II. *Admiralty Jurisdiction under 46 U. S.C. § 740.*

If the Government did at least supply Dunbar with maps and information as to the depths of the river or specifications as to where the dredging was to be done then admiralty jurisdiction under the Admiralty Jurisdiction Extension Act would be proper.

It is not contended that a dredge such as the one involved here is not a vessel, see Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047 (1907); 1 Benedict, Admiralty 112–113 (6th Ed. 1940) and cases cited therein, or that the Chicago River is not navigable water. Petersen's main contention for denying the application of admiralty jurisdiction is that the alleged tortious conduct of the Government took place on land and the injury occurred on land.

1. Occurrence of tortious conduct on land.

 Traditionally admiralty jurisdiction over torts has depended on whether the injury was inflicted upon navigable waters, irrespective of where the wrongful acts or omissions occurred. And there must be some relationship between the wrong and some maritime service, navigation, or commerce on navigable waters. 1 Benedict, Admiralty 351 (6th Ed. 1940); Chapman v. City of Grosse Pointe Farms, 385 F.2d 962 (6th Cir. 1967); O'Connor & Company v. City of Pascagoula, Mississippi, 304 F.Supp. 681 (S.D.Miss.1969).

In Dunn v. Wheeler Shipbuilding Corporation, 86 F.Supp. 659 (E.D.N.Y. 1949) a crewman of a vessel was killed when it capsized and sank. His administrator sued the manufacturer of the vessel and the marine architect who designed and prepared the plans and specifications for the building and construction of the vessel alleging negligence in

---

1. The Government's response intimates that for the purpose of this motion Petersen is now bound by this allegation. While this may be technically correct, it certainly would not be in the interests of justice to so proceed. The Government itself denied the allegation and the court could freely permit amendments. See 2A Moore, Federal Practice 2462. (2nd Ed. 1968).

2. Because of the view that the court takes of this case, there is no reason at this time to consider Petersen's contention that the United States committed a tort by failing to fulfill the duty an occupant of land upon which excavations are made owes to the owner of adjoining lands and structures as prescribed by Ill.Rev.Stat., Ch. 70, Sec. 10. But see Chapman v. City of Grosse Pointe Farms, 385 F.2d 962 (6th Cir. 1967) and Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969).

their respective functions. The court said "that which the libels portray is clearly a maritime tort, i. e., the alleged error in design, although originating on land, became manifest, if at all, upon the high seas." In Hess, Inc. v. The Arizona, 149 F.Supp. 733 (S.D.N.Y.1955), aff'd 242 F.2d 706 (2nd Cir. 1957) a vessel attempting to dock ran aground and collided with the dock doing damage to both vessel and dock. In his libel in admiralty the vessel owner recovered from the dock owner solely on the ground that the dock owner had supplied him with an erroneous sounding chart which had caused the vessel to ground.

In both of the above cases admiralty jurisdiction was proper even though the wrong, supplying some incorrect information or design, occurred on land. The injury, however, was inflicted at a spot otherwise within admiralty jurisdiction and the tort was maritime in nature. See also Patel Cotton Co. v. The Steel Traveler, 111 F.Supp. 821 (S.D.N.Y. 1953); Todd Shipyards Corporation v. United States, 69 F.Supp. 609 (D.Me. 1947); The S.S. Samovar, 72 F.Supp. 574 (N.D.Cal.1947).[3]

2. Occurrence of injury on land.

When the operation of a vessel resulted in injury to a land or shore structure, such as a bridge or dock, the traditional American rule was that an action to recover for the loss to the structure was not within the jurisdiction of admiralty. Gilmore and Black, Admiralty 433 (1957); 1 Benedict, supra at 353.

Since the substance and consummation of the injury occurred on land or an extension of it, the tort was non-maritime. The Plymouth, 70 U.S. (Wall) 20, 18 L. Ed. 125 (1865). This rule led to much criticism and inequities as injuries to a ship by a shore structure were within the admiralty jurisdiction.[4]

■■■ In 1948 Congress remedied this situation by providing that the admiralty jurisdiction should thenceforth extend to all injuries "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740. The statute was not intended to cover only the ship-to-shore collision situation where the vessel itself was the physical instrumentality causing the injury. In Salaky v. Atlas Tank Processing Corp., 120 F.Supp. 225 (E.D.N.Y.1953), reversed on other grounds 208 F.2d 174 (2nd Cir. 1953), row boats moored on land or a shore structure were damaged by oil sludge discharged from certain barges. The court upheld recovery under 46 U.S.C. § 740. See also Hovland v. Fearnley & Eger, 110 F.Supp. 657 (E.D.Pa.1952); Petition of New Jersey Barging Corporation, 168 F.Supp. 925 (S.D.N.Y.1958); and Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). Nor was the statute intended to be limited by a strict construction of the phrase "caused by a vessel" as Petersen so contends and the court will not deny its application because no government employee was a

---

3. Jemison v. The Duplex, 163 F.Supp. 947 (S.D.Ala.1958) was a case involving a fact situation very similar to the one involved here. In that case the United States had contracted to have a channel dredged and furnished plans and specifications for the dredging. During the dredging certain wharves of the plaintiff subsided. The plaintiff sued the contractor and subcontractor and the subcontractor impleaded the United States. The United States moved to dismiss the impleader for want of admiralty jurisdiction. The motion was denied. Whether the court thought the complaint alleged a maritime tort or whether it alleged a non-

maritime tort but as such was merely a subsidiary or derivative issue in a litigation clearly maritime thereby justifying joint trial is not clear. 1 Benedict, supra at 356 (1968 Supplement at 160) cites the case apparently for the former proposition.

4. Thus in the ship-to-shore collision the owner of the shore structure may find himself completely barred by his contributory negligence while the ship owner could take advantage of admiralty's divided damages rule. The shore owner would also be without a maritime lien or right to proceed in rem against the ship. Gilmore and Black, supra at 432.

member of the dredge's crew or that the Government may have been only indirectly concerned with the operation of the vessel. See United States v. Matson Nav. Co., 201 F.2d 610 (9th Cir. 1953) and Francese v. United States, 229 F. Supp. 10 (E.D.N.Y.1964). The whole basis of Petersen's claim is that the alleged damage to its dock was a result of the dredging operation performed by a vessel. And Petersen's claim against the Government here considered stems from its alleged misdirection of that vessel. If Petersen had a vessel damaged because of the improper dredging, his cause of action against the United States would be in admiralty. It should make no difference because it was its dock which was damaged. See U.S.Code Cong.Service, 80th Cong. 2nd Sess., Vol. 2, 1948, p. 1899. To deny application of § 740 in this situation would revive the artificial distinction Congress was concerned with abolishing and ignore the maritime nature of the Government's activities.

III. *United States Consent under the Suits in Admiralty Act.*

If there is a remedy against the United States under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, then suit under the Federal Tort Claims Act is barred. 28 U.S.C. § 2680(d). 46 U.S.C. § 740 provides that suits against the United States for damage done on land by a vessel on navigable water under the Public Vessels Act, 46 U.S.C. §§ 781–790 or the Suits in Admiralty Act may not be filed until six months after an administrative claim has been made. Department of Highways, State of La. v. United States, 204 F.2d 630 (5th Cir. 1953). The Federal Tort Claims Act, as applicable here,[5] has no such requirement.

Prior to 1960, 46 U.S.C. § 742, which is the section of the Suits in Admiralty Act wherein the United States has consented to be sued, read: "In cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained * * * a libel in personam may be brought against the United States, * * * provided such vessel is employed as a merchant vessel." "Such vessel" refers back to 46 U.S.C. § 741 which speaks of "vessel owned by * * * or in the possession of * * * or operated by or for the United States." "Such cargo" refers back to the same section which speaks of "cargo owned or possessed by the United States." The Government concedes that before 1960 in cases not involving Government vessels it had not consented to be sued under the Suits in Admiralty Act and that the Federal Tort Claims Act constituted the Government's waiver of sovereign immunity for maritime torts not involving Government vessels. For example, Somerset Seafood Co. v. United States, 95 F.Supp. 298 (D.Md.1951) involved a vessel which collided with a wreck that had been negligently created and marked by the United States. In rejecting the contention that 28 U.S.C. § 2680(d) precluded application of the Federal Tort Claims Act the court stated "They (the Suits in Admiralty Act and the Public Vessels Act) are concerned principally with torts which may be committed by vessels owned and used by the United States as public vessels or as merchant vessels. But there are other types of maritime torts * * *" The Court of Appeals affirmed this reasoning at 193 F.2d 631 (4th Cir. 1951). The decisions in Moran v. United States, 102 F.Supp. 275 (D.Conn.1951); Steamtug Aladdin, Inc. v. City of Boston, 163 F.Supp. 499 (D. Mass.1958); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960) are in accord.

■■ In 1960, Congress amended 46 U.S.C. § 742. Pub.L.No.86–770, 80th Cong. 2nd Sess., 74 Stat. 912 (Septem-

---

5. 28 U.S.C. § 2675 now makes it mandatory that a claim in writing for injury or damage to property be filed with the federal agency involved at least six months prior to instituting suit.

ber 13, 1960). The Government contends that by the inclusion of the words "or if a private person or property were involved" Congress intended to include all maritime torts within the Suits in Admiralty Act and not just those involving vessels owned, possessed, or operated by or for the Government. Although the cases cited by the Government, Beeler v. United States, 224 F.Supp. 973 (W.D.Pa.1964), reversed on other grounds, 338 F.2d 687 (3rd Cir. 1964); Utzinger v. United States, 246 F.Supp. 1022 (S.D.Ohio 1965); Tankredereit Gefion A/S v. United States, 241 F.Supp. 83 (E.D.Mich.1964) do support that proposition, this court believes that the 1960 amendment had no such purpose.

The original purpose of the 1920 Suits in Admiralty Act was to free government shipping, both ships and cargo, from the inconvenience of arrest and seizure, and in lieu thereof to provide a remedy by a libel in personam for persons entitled to redress from the United States by reason of the operation of government ships or the transportation of government cargo. Prudential Steamship Corporation v. United States, 220 F.2d 655 (2nd Cir. 1955). The 1960 Amendment was not intended to change this basic purpose of the statute by enlarging the jurisdiction it conferred but was merely an attempt to alleviate the problems stemming from the fact that suits against the United States involving certain maritime transactions could be brought either in the Court of Claims under the Tucker Act, 28 U.S.C. §§ 1346, 1491, or in the District Court under the Public Vessels Act, or Suits in Admiralty Act. See U.S.Code Cong. and Admin.News, 86th Cong. 2nd Sess., Vol. 2, pp. 3583, 3584 (1960). Because of certain confusing language in the statutes suits were often erroneously filed under one statute in one court and then dismissed because it was too late to refile the suit under the correct statute in the other court. The amendment, therefore, authorized transfer of cases between the District Courts and Court of Claims and vice versa while tolling the statute of limitations. 28 U.S.C. §§ 1406(c), 1506. To eliminate the cause of the problem the confusing language was clarified or eliminated. The requirement in the Suits in Admiralty Act that the Government vessel be operated as a "merchant vessel" which had created the most confusion and had given rise to the possibility that the Government vessel could fall outside the scope of both the Suits in Admiralty Act and the Public Vessels Act was eliminated. See Gilmore and Black, supra at 775. The words "or if a private person or property were involved" were added not to bring all maritime torts by the Government into the statute's range but more likely merely to: (1) avoid the technical distinction of when goods owned by the Government to be carried on a vessel have ceased to be "merchandise" and have become "cargo" which was the point of decision in Ryan Stevedoring Co. v. United States, 175 F.2d 490 (2nd Cir. 1949). U.S.Code Cong. and Admin.News, 86th Cong. 2nd Sess., Vol. 2, p. 3586 (1960); (2) confirm that the Act was not limited to cases where prior to it the Government vessel could have been seized in rem but went farther and gave a remedy in personam against the United States both in cases where only the vessel would be liable and in those cases where the owner of the vessel, if privately owned, would be personally liable. See Pennsylvania Railroad Company v. United States, 245 F.2d 321 (2nd Cir. 1957); and (3) lay to rest the notion that the Government's ownership of cargo must be directly connected with the Government's ownership and operation of a vessel. See Prudential Steamship Corporation v. United States, supra.

That the 1960 amendment was not intended to change the requirement of a vessel "owned by * * * or in possession of * * * or operated by or for the United States", is supported by the immediate statutory context of the phrase in question. Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L. Ed.2d 945 (1964). The full title of the chapter embracing 46 U.S.C. § 742 is

Suits in Admiralty By or Against Vessels or Cargoes of United States. The amended 46 U.S.C. § 742, itself, still speaks of suits being brought in the district "in which the vessel or cargo charged with liability is found". And 46 U.S.C. § 740 speaks of presenting a claim to the "agency owning or operating the vessel" involved. Ira S. Bushey & Sons, Inc. v. United States, 276 F. Supp. 518 (E.D.N.Y.1967), reversed on other grounds, 398 F.2d 167 (2nd Cir. 1968); 1 Jayson, Handling Federal Tort Claims, § 7.01 (1964); 2 Jayson, supra at § 257; and Petition of United States, 216 F.Supp. 775 (D.Or.1963) also support the view that a Government vessel is still required. Based on the foregoing, the court concludes that unless the vessel was "owned by * * * in the possession of * * * or operated by or for the United States" there is no remedy available under the Suits in Admiralty Act.

 If that be so, then there is no bar to an action under the Federal Tort Claims Act. Under that Act the court must apply the "law of the place where the act or omission occurred". 28 U.S.C. § 1346(b). The "law of the place" includes the state's choice-of-law rules. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969). If the tort is within the application of maritime law, then the state court would be required to apply that law. Hess v. United States, 361 U.S. 314, 80 S.Ct. 341, 4 L.Ed.2d 305 (1960); Gowdy v. United States, supra.

IV. *Owned by * * * or in the possession of * * * or operated by or for the United States.*

This phrase has been subject to little judicial construction. Since the pleadings are unclear as to the actual involvement of the United States in the operation of the vessel, the court need say only a few words.

It seems fairly clear that the United States neither owned or possessed the dredge involved here, so the real issue is whether the vessel was "operated by or for the United States."

In Matson Navigation Co. v. United States, 284 U.S. 352, 52 S.Ct. 162, 76 L. Ed. 336 (1932), the United States requisitioned for its use several merchant vessels then owned and operated by the petitioner. The Shipping Board then entered into a contract called a "requisition charter" for the operation of each vessel. It provided that the vessel should remain in the service of the United States, to be employed as it might determine, but that petitioner should operate the vessel, furnish new equipment and pay for provisions, wages, shipping fees, and supplies. The United States agreed to pay to petitioner certain enumerated expenses of maintenance and operation of the vessel and ship hire at a monthly rate. The court held that the vessels were operated for the Government. In A. H. Bull S. S. Co. v. United States, 105 F.Supp. 474 (S.D.N.Y.1952) the court held that a vessel was operated for the United States where the Maritime Commission employed her under a time charter relationship which left the Commission in control of the voyages made, goods carried and performance of its orders by master and crew. Epstein v. United States, 86 F.Supp. 740 (S.D. N.Y.1949) and Burkholder v. United States, 60 F.Supp. 700 (E.D.Pa.1944) involved vessels requisitioned by the United States and operated under a time charter with the War Shipping Administration which were held to be operated for the United States. In N.S. Byonnes & Son Dampskibsrederi Aktieselskab v. United States, 209 F. 123 (S.D.N.Y. 1923), the court held that a vessel chartered to the United States and then subchartered to another was not operated for the United States and intimated that much Government control would be necessary to bring a vessel within that phrase. See Burkholder v. United States, supra 60 F.Supp. at 703.

██ Although the above cases leave much of a vacuum, it would seem to the court that extensive operation or direction of the vessel by government person-

nel would be required to make the vessel operated "by the United States" and something closer to a time charter where the Government directs the vessel's overall functions even though the owner may control the operation of the vessel's personnel and equipment rather than a single purpose contract entered into with an independent contractor would be required to make the vessel "operated for the United States".

The motion to dismiss is denied.